**Cite as:  Opinion No. 94-047 (September 21, 1994) (unpublished)**

**COLLEGES & UNIVERSITIES ) UNIVERSITY OF MARYLAND SYSTEM
) UNIVERSITY OF MARYLAND AT BALTIMORE MAY AGREE TO A
REIMBURSEMENT FROM UNIVERSITY OF MARYLAND MEDICAL
SYSTEM CORP. ON A NEGOTIATED FEE-FOR-SERVICE BASIS**

September 21, 1994

*Dr. Donald N. Langenberg*
*Chancellor*
*University of Maryland System*

You have requested our opinion concerning the legal requirement for reimbursement by the University of Maryland Medical System Corporation to the University of Maryland at Baltimore for services rendered to the Corporation by the University.  Specifically, you ask whether the University is required by §13-1B-06 of the Education ("ED") Article, Maryland Code, to obtain reimbursement on the basis of the actual cost of services provided, or whether the University may agree (as it has in the past) to accept reimbursement based on predetermined amounts.

For the reasons stated below, we conclude that ED §13-1B-06 permits the University to agree to reimbursement for services based on negotiated fee-for-service amounts.

**I**

**Annual Agreement Between Corporation and University**

ED §13-1B-06 requires an annual contract between the Corporation and the University that reflects the intimate association between the two and allocates between them the costs of that association.  The section provides that the annual contract "shall state all financial obligations, exchanges of services, and any other agreed relationships between the University and the Medical System Corporation for the ensuing fiscal year ... [and] shall identify all services to be provided and the agreed cost of such services."  ED §13-1B-06(a).

The Corporation and the University have entered such a contract annually since the creation of the Corporation in 1984.  *See* Chapter 288 of the Laws of Maryland 1984.  The agreement for the fiscal year ending June 30, 1994, recites that the Medical System Corporation and the schools that constitute the University of Maryland at Baltimore "have long-standing, historic associations and enjoy close, cooperative and effective working relationships; ... it is the desire and purpose of the

University ... and the ... Corporation to perpetuate and strengthen these relationships." Agreement at 1.

This relationship requires the University to provide a range of services to the Corporation. Most notably, physicians who are faculty members at the Medical School provide teaching and supervisory services at University Hospital and the Shock Trauma Center. Other professional services are provided by faculty members of the Pharmacy and Dentistry Schools. In addition, the University provides a range of administrative and support services to the Corporation, and various employees and units of the University and the Corporation use space in each other's buildings.

## II

### Agreed Costs

Most of the services provided by the University to the Corporation are reimbursed on the basis of predetermined costs. For example, under Article IV, §A, ¶1 of the contract, "[t]he School of Medicine shall assign members of its clinical faculty to be responsible (a) for teaching and supervision of residents working in the facilities of the Medical System Corporation as part of their graduate medical education programs and (b) for administrative and supervisory functions on behalf of the Medical System Corporation as required for accreditation of its facilities and programs and as necessary for its efficient operation." The contract then states the obligation of the Corporation to pay the School of Medicine "the sum stated in Schedule 2 as compensation for these services." Schedule 2, in turn, is a listing of amounts of reimbursement for faculty services arranged by faculty department.[1] The total for all departments is approximately $8.5 million, not counting fringe benefit costs.

This schedule of reimbursement is not necessarily fixed, because the contract states the parties' anticipation that "compensation will be increased during the fiscal year as new programs are implemented or additional faculty begin to provide services." Article IV, §A, ¶1. The schedule of reimbursement does not correlate to any stated level of services, however, nor is there a provision in the contract calling for a reconciling of the reimbursement amount to the actual level of services provided.[2]

The Legislative Auditor has criticized the University for its failure to "establish procedures to ensure that the actual level of all services provided to the Corporation is the basis for the amount to be reimbursed. The Legislative Auditor recommended that "the annual contract include a provision

---

[1] The amount allocated for the services of the Surgery Department, for example, is nearly $2 million.

[2] The contract does contain at least one aspect of reimbursement that would vary with actual services rendered. Exhibit B to the contract describes, among other things, the public safety services that the University provides to the Corporation. One of these is "[i]nvestigation of all reported incidents billed as a fee-for-service item. Court time will also be billed. Time will be billed at the University's costs, taking into account shift differentials where applicable."

which specifies that actual costs will be the basis for the reimbursement of services provided under the contract." In addition, the Legislative Auditor has stated that "the actual space occupied should be the primary basis for allocating rental costs for space," rather than the equal allocation arrived at by negotiations between the parties.

We express no view on these recommendations as a matter of policy. We are of the view, however, that the University is not required by law to include actual cost provisions in the annual contract.

ED §13-1B-06(a) requires the annual contract to "state all financial obligations, exchanges of services, and any other agreed relationships between the University and the Medical System Corporation for the ensuing fiscal year ... [and to] identify all services to be provided and the agreed cost of such services." The approved annual contracts have addressed all of these subjects and stated the services and relationships between the parties.

The specific reference to "the *agreed* cost of such services" necessarily implies a meeting of the minds between two parties, not just a unilateral imposition of some calculated rate or amount. The earlier references to *"agreed* relationships" and "exchanges of services" also imply a process of negotiation, trading, and common understanding or consent, rather than a requirement that one party adhere to the other's calculated or "actual" costs.

The pertinent legislative history does not suggest that the term "agreed cost" was intended to be construed as "agreed *actual* cost." ED §13-1B-06 got little attention during the legislative process; it was unchanged from the version in the bill as introduced. The Assistant Legislative Officer who testified in support of this administration bill simply described the section as providing for "an annual contract that would specify the services, personnel, and financial relationships between the Corporation and the University." Testimony of Frederick R. Millhiser on House Bill 674 and Senate Bill 481, at 3. The Fiscal Note identified certain amounts that the Corporation would pay to the University in Fiscal Year 1985 for "payroll and benefits administration services" and "a variety of support services," but did not otherwise discuss reimbursements. Revised Fiscal Note on Senate Bill 481, at 2 (April 18, 1984).

The language calling for agreement, and hence implying some discretion as to the nature of the agreement, may reflect a legislative recognition that calculating the exact amount or value of these services would be difficult or perhaps impossible. Certain functions (for example, supervision of residents) are inherently shared between the University and the Corporation, and many faculty and other employees perform functions for both entities, with no clear break in their time or location of duties. Thus, even if the functions (or space) could be theoretically separated, the burden of record-keeping that would be required might be thought unwarranted or even inimical to the cooperative relationship that is a fundamental objective of the statute.

We are not suggesting, of course, that the University is free to agree to levels of reimbursement that would be so disproportionate to any fair estimation of the University's services as to negate the concept of cost reimbursement. Suppose, for example, that the University agreed to accept $850 for faculty services, instead of $8.5 million. So extreme an imbalance between value

and reimbursement would be an abuse of the discretion given the University under ED §13-1B-06. There is no suggestion, however, that prior contracts reflected anything other than the good-faith exercise of discretion, not its abuse.

## III

## Conclusion

In summary, it is our opinion that ED §13-1B-06 does not require the University to contract with the Corporation for reimbursement on the basis of actual costs.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
*Opinions & Advice*